EXHIBIT A

<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                 Plaintiff,         )
                                      )
 6                                    ) Case No.
          vs.                         ) 8:24-MJ-01280-AAS
 7                                    )
                                      )
 8   THOMAS PAUL OSBORNE,             )
                                      )
 9                 Defendant.         )

10

11

12   _____

13             INITIAL APPEARANCE AND DETENTION HEARING
           BEFORE THE HONORABLE AMANDA ARNOLD SANSONE
14              UNITED STATES MAGISTRATE JUDGE

                      FEBRUARY 22, 2024
15                       4:28 P.M.
                       TAMPA, FLORIDA
16   _____

17

18

19

20

21         Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
22   transcription.
23   _____
              DAVID J. COLLIER, RMR, CRR
24          FEDERAL OFFICIAL COURT REPORTER
          801 NORTH FLORIDA AVENUE, 7TH FLOOR
25              TAMPA, FLORIDA  33602
</pre>

1    **APPEARANCES:**

2

3    **FOR THE GOVERNMENT:**

4

5              Risha Asokan

6              United States Attorney's Office

7              400 North Tampa Street, Suite 3200

8              Tampa, Florida  33602

9              (813) 274-6000

10

11

12   **FOR THE DEFENDANT:**

13

14             Sylvia A. Irvin

15             Federal Public Defender's Office

16             400 North Tampa Street, Suite 2700

17             Tampa, Florida  33602-4726

18             (813) 228-2715

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                     - - - o0o - - -

 3              THE COURT:  I'll go ahead and call the last case.

 4              Case Number 24-MJ-1280-AAS is the case here in the

 5   Middle District.  This is a case out of Washington D.C., the

 6   District of Columbia, and the case number there is 1:24-CR-94.

 7              Can Counsel state their appearances, starting with

 8   the Government.

 9              MS. ASOKAN:  Good afternoon, evening, Your Honor.

10   Risha Asokan for the United States.

11              THE COURT:  I don't think we've gotten to evening

12   just yet.  I think we've been pretty efficient today.

13              Go ahead, Ms. Irvin.

14              MS. IRVIN:  Good afternoon, Your Honor.  Sylvia Irvin

15   on behalf of Mr. Osborne, who is seated to my left.

16              THE COURT:  Thank you.  Okay.

17              And, Mr. Osborne, you've now had the benefit of

18   hearing me say what I'm going to say multiple times, so you

19   know all the questions I'm getting ready to ask.  The first

20   question though is:  Do you have any mental or physical

21   condition that would make it difficult for you to participate

22   in this hearing?

23              THE DEFENDANT:  No, Your Honor.

24              THE COURT:  And -- hold on one second.

25              Mr. Plunkett, if you could explain to the family
```

1  members that she'll be released from the fourth floor, so

2  that -- thank you so much.

3          Ms. Irvin, is there anything else you think the

4  family members should know while Mr. Plunkett --

5          MS. IRVIN:  No, Your Honor.  I'm actually going to

6  meet them on the fourth floor afterwards, so --

7          THE COURT:  Okay.

8          MS. IRVIN:  -- I'll explain --

9          THE COURT:  Okay.

10         MS. IRVIN:  -- everything else at that time.

11         THE COURT:  Perfect.  You already told them.  Okay.

12         MS. IRVIN:  Thank you.

13         THE COURT:  Thank you.

14         I should have known that you'd already told them, but

15  I just figured -- while we had Mr. Plunkett here, I figured

16  I would take advantage of it.

17         MS. IRVIN:  Well, I appreciate it, Your Honor,

18  because I didn't even think about having them use the

19  headphones during the hearing, so --

20         THE COURT:  Well, don't thank me for that, thank

21  Mr. Plunkett for that.  I didn't think about that either.  Now

22  I'll know that that's an option.

23         Okay.  So, Mr. Osborne, the question I was asking you

24  is if you have any mental or physical condition that would make

25  it difficult for you to participate in this hearing.

```
 1              THE DEFENDANT:  No, Your Honor.

 2              THE COURT:  And have you taken any medication, drugs,

 3  anything that would make it hard for you to focus the rest of

 4  the time today?

 5              THE DEFENDANT:  No, Your Honor.

 6              THE COURT:  And you're welcome, if you want to --

 7  Ms. Irvin can even use that microphone and you could pull the

 8  other one over to yourself, if that's easier.  It doesn't --

 9  I mean, that way you don't have to crane your neck each time.

10              There we go.

11              Okay.  Is that a little bit better?  There we go.

12              And were you listening when I advised the group

13  earlier of your right to have an attorney in this case?

14              THE DEFENDANT:  Yes.

15              THE COURT:  And do you understand your right to

16  counsel?

17              THE DEFENDANT:  Yes.

18              THE COURT:  And looking at your financial affidavit,

19  yours is a close call, particularly because you have the

20  benefit of getting money even when you're not working, and then

21  you're working -- it looks like you're only working part time,

22  so, you know, frankly, I do think you have the capacity to be

23  earning more and to be able to afford counsel, to retain

24  counsel; however, for purposes of today, I am going to appoint

25  counsel for you.
```

1      Counsel that gets appointed here doesn't go up to

2  Washington D.C. with you anyway, so you'll end up -- they'll do

3  another assessment in Washington D.C. to determine if you

4  qualify.  My -- the minutes from today are going to say that

5  I thought it was a close call, so I will go ahead and advise

6  you that the Government likely may argue up in D.C. that you

7  don't qualify for appointed counsel, or the Judge may determine

8  that you don't qualify for appointed counsel, or even if the

9  Judge does determine that you qualify, they may caution you,

10  like I'm going to now, that you may be required at some point

11  to have to reimburse the Government for a portion of your

12  representation if you are appointed counsel.  Do you understand

13  that?

14      THE DEFENDANT:  Yes, Your Honor.

15      THE COURT:  Okay.  But for purposes of today, would

16  you like for me to appoint counsel for you?

17      THE DEFENDANT:  Yes, Your Honor.

18      THE COURT:  And, Ms. Irvin, does your office accept

19  the appointment?

20      MS. IRVIN:  Yes, Your Honor.

21      THE COURT:  Thank you.

22      And, again, I'll just explain it one more time.

23  Ms. Irvin is obviously here today, she's able to represent you,

24  they've had a lot of experience with these January 6th cases

25  where they have represented locally and then they hand off the

1  case when it goes up to Washington D.C. and when you have your

2  first hearing there.

3           Do we have the information for his first hearing yet?

4           MS. IRVIN:  (Inaudible.)

5           THE COURT:  Okay.  Sometimes -- sometimes I've come

6  into these hearings already knowing when your next hearing is

7  going to be in D.C., and I believe they're doing those by Zoom,

8  but anyway, just so you understand, you may end up, you know,

9  getting other counsel appointed to you, or you may not, but

10  regardless, or if you retain counsel, it will be a very smooth

11  handoff between Ms. Irvin and her office and whoever ends up

12  representing you in Washington D.C., okay?

13           THE DEFENDANT:  Okay.

14           THE COURT:  Do you need -- I know we've had a lot of

15  hearings since you probably had a chance to speak to Ms. Irvin.

16  Did you need to speak to her, or are you ready to go forward?

17           THE DEFENDANT:  I think we're okay.

18           THE COURT:  If you need to talk to her during this

19  hearing at all, you're obviously sitting right next to her, so

20  it's pretty easy, just let me know so we can mute the

21  microphones so that nothing you say gets recorded while you're

22  talking to her, okay?

23           THE DEFENDANT:  Okay.

24           THE COURT:  And you have some additional rights today

25  simply because you were arrested here in this district for a

1  crime that is charged to have occurred in the District of
2  Columbia.

3        According to the Indictment, you were charged in
4  three counts.  Count One is on or about January -- I'm sorry,
5  four counts.  Count One is on or about January 6th of 2021,
6  that you committed and attempted to commit an act to obstruct,
7  impede or interfere with a law enforcement officer lawfully
8  engaged in the lawful performance of his or her official duties
9  incident to and during the commission of a civil disorder which
10 in any way and degree obstructed, delayed and adversely
11 affected commerce and the movement of any article and commodity
12 in commerce and the conduct and performance of any federally
13 protected function.  And so that's a civil disorder, it's
14 charged in violation of Title 18, United States Code, Section
15 231(a)(3).

16       Count Two, same date, that you knowingly entered and
17 remained in a restricted building and grounds, specifically the
18 restricted area within the United States Capitol and its
19 grounds, and that's where the Vice President was and would be
20 temporarily visiting, and you did not have lawful authority to
21 be there, and that's charged to be in violation of Title 18,
22 United States Code, Section 1752(a)(1).

23       Count Three, again, January 6th, 2021, that you did
24 knowingly and with intent to impede and disrupt the orderly
25 conduct of Government business and officials functions, engage

1   in disorderly and destructive conduct in and within such

2   proximity to a restricted building and grounds, specifically

3   the restricted area of the Capitol and its grounds, where the

4   Vice President was and would be temporarily visiting, and that

5   your conduct did in fact impede and disrupt the orderly conduct

6   of Government business and official functions, and that's

7   charged in violation of Title 18, United States Code, Section

8   1752(a)(2).

9           And then, last, Count Four, same date, that you

10  willfully and knowingly engaged in disorderly and destructive

11  conduct within the United States Capitol grounds and in any of

12  the Capitol buildings with the intent to impede, disrupt and

13  disturb the orderly conduct of a session of Congress and either

14  House of Congress, and the orderly conduct in that building of

15  a hearing before or any deliberation of a committee of Congress

16  or either House of Congress, and that's charged to be in

17  violation of Title 40, United States Code, Section

18  5104(e)(2)(D).

19          Do you understand that those are the charges that are

20  being brought against you?

21          THE DEFENDANT:  Yes.  Yes, Your Honor.

22          THE COURT:  And were you listening earlier when

23  I advised you of your right to remain silent?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  And do you understand your right to

1 remain silent?

2       THE DEFENDANT:  Yes, Your Honor.

3       THE COURT:  You also, as I already indicated, have

4 some additional rights.  You have the right to an identity

5 hearing to -- a hearing to show that you are the person that's

6 been charged in this Indictment from another district.  You can

7 either waive that right or ask to have that hearing in D.C.

8       Ms. Irvin, how does he wish to proceed with the

9 identity hearing?

10       MS. IRVIN:  Your Honor, may I have just one moment?

11       THE COURT:  Yes.

12       MS. IRVIN:  Thank you.

13       Your Honor, Mr. Osborne is going to waive his right

14 to an identity hearing.

15       THE COURT:  Okay.  You also have the right to have

16 this case transferred to this district, but -- and it's a big

17 but -- only if you plead guilty to these four charges and only

18 if both the U.S. Attorney's Office in the District of Columbia

19 and the U.S. Attorney's Office here in this district agree that

20 you can transfer your case to here; and you have the right to

21 have the matter of bail considered, either here today or you

22 have the right to have that matter considered in

23 Washington D.C., or you can reserve on that issue and come back

24 by way of a motion here or there.

25       Have you discussed with him, Ms. Irvin, how he wishes

1  to proceed with regard to the detention hearing?

2          MS. IRVIN:  Yes, Your Honor.  We'd like to have the

3  detention hearing here, and we're ready to go forward.

4          THE COURT:  And what is the Government's position on

5  the detention or release of Mr. Osborne?

6          MS. ASOKAN:  Thank you, Your Honor.

7          The Government is seeking detention in this case

8  under 18 U.S.C. 3142(f)(2), serious risk of flight.  I'm

9  prepared to make an argument on that at this time if the Court

10  is ready.

11          THE COURT:  Go ahead.

12          MS. ASOKAN:  Okay.  Your Honor, as I said, the basis

13  for detention is (f)(2)(A), serious risk of flight.  I know

14  it's almost five o'clock, but with the Court's indulgence, I do

15  think it's important to go over some context and background in

16  this case which will give light to why the Government is

17  seeking detention, and that we're not taking a restraint on the

18  defendant's liberty lightly in this case.

19          Your Honor, as you know, the defendant has been

20  charged for his conduct in the January 6th Capitol riot.  It's

21  important to know that when he traveled from Florida to D.C. he

22  didn't travel alone, he traveled with a group of other

23  individuals from a similar area of Polk County, namely the

24  Pollock family.

25          Now, the Court might be aware of who the Pollocks

are.  They've gained some notoriety in the past couple years because of both their conduct at the Capitol that day, including violent acts by some of the members of the Pollock family, but also the fact that two members of the Pollock family, after being charged federally for their conduct at the Capitol, have fled prosecution, and one member of the Pollock family, Jonathan Pollock, was a fugitive for approximately two and a half years until he was apprehended in January of this year; and his sister, Olivia Pollock, was a fugitive for almost a year.  She fled -- she cut her GPS monitor last year, she fled law enforcement, and managed to successfully evade detection until January of this year, when she and her brother were apprehended at the same time.

So Mr. Osborne has a connection to that family.  He actually works for their company.  I think you probably saw in the Pretrial Services Report that he works for Rapture Guns and Knives.  That is the Pollock family's business.  He's very close to them.  I'm proffering right now, but, you know, if the Court were to continue this, I'd be happy to bring in witnesses to testify to the fact that they also have somewhat of a personal relationship.  I understand that they engage in a prayer group together.  But all of that is to say there is a close relationship between the Pollock family and Mr. Osborne.

And why that ties to risk of flight is because the FBI has reason to believe that the Pollock family, the parents,

1  Ben and Tina Pollock, were involved in harboring their

2  children.  As I mentioned before, Jonathan Pollock was charged

3  by Criminal Complaint, and when the FBI went to his home in

4  I believe it was June of 2021 here in Polk County, he was

5  nowhere to be found, and he's been -- he was a fugitive for

6  approximately two and a half years.  Based on investigation, we

7  have reason to believe that the Pollock family knew where their

8  son was this entire time and assisted in concealing him from

9  the Government.

10         Same thing with Olivia Pollock, she was arrested

11  during that June 2021 search of the Pollock family's house in

12  Polk County, she went to D.C., she was going through those

13  proceedings, and then in I believe it was February of last year

14  she cut her GPS monitor and fled prosecution.  We believe that

15  Olivia and Jonathan along the way met up and that their parents

16  actually helped them stay out of law enforcement detection.

17         All of that came to a head at the end of last year,

18  beginning of this year, when the FBI was -- based on credible

19  information, was able to locate the Pollock family.  They were

20  in -- I'm forgetting the name now, but it's a town outside of

21  Orlando, close to Ocala, and they were found on a farm there

22  doing ranch work.  People knew that they were there, and the

23  FBI has reason to believe that Ben Pollock, the father of

24  Olivia and Jonathan Pollock, knew his kids were there and was

25  helping keep them out of law enforcement detection.

1          So I mention the Pollock family because Mr. Osborne

2   has very close ties to this family, Your Honor.  He has access

3   to a network of people who the FBI, the Federal Government,

4   knows has harbored January 6th fugitives in the past.  So this

5   is not the usual case of somebody who maybe doesn't have ties

6   to the community because they're from a different country, or

7   they have lots of money and they have a passport, frequency of

8   international travel.  Rather, we have a demonstrated case here

9   of a network of people who help January 6th defendants escape

10  prosecution.

11          So, Your Honor, he has -- he has that access, but

12  perhaps even more concerning than that, Your Honor, is the fact

13  that Mr. Osborne himself has also helped another January 6th

14  defendant escape prosecution.  That defendant is Christopher

15  Worrell.  He is from this jurisdiction as well.  He was tried

16  by bench trial last summer, found guilty on all counts for his

17  conduct in the January 6th riot that took place, and prior to

18  sentencing he also cut his GPS monitor and left a letter for

19  his girlfriend and said that, you know, he needed to go.

20          THE COURT:  What was -- can you spell the last name?

21          MS. ASOKAN:  W-O-R-R-E-L-L.

22          THE COURT:  Okay.

23          MS. ASOKAN:  So Mr. Worrell cuts his GPS monitor and

24  he is on the lamb for approximately six weeks.  We know from

25  our investigation that Mr. Osborne helped Mr. Worrell evade

1 law enforcement detection.  He actually let Mr. Worrell stay in
2 his home.  We know that.  There was a search warrant that was
3 executed at Mr. Osborne's home in December of '23.  We found
4 evidence of the fact that Mr. Worrell was in fact staying
5 there.
6       So in this case, Your Honor, Mr. Osborne has -- he
7 has means, he has a knowledge of risk of flight, he has access,
8 and now that he's been charged himself, he certainly has the
9 motivation.  These are extremely unique circumstances as it
10 relates to risk of flight.
11       And the last thing I'll say too about the Pollock
12 family is that his ties to this community are that family.  As
13 you can see in the -- in the Pretrial Services Report, he lives
14 by himself.  His father lives in -- I think it was
15 Pennsylvania.  He really doesn't have ties to this community.
16 It's my understanding that the Pollock family is sort of a
17 surrogate family to him, and that should give the Court grave
18 concern as it concerns his risk of flight and whether he will
19 stay and his -- and the guarantee of his appearance here.
20       Now, just going to the factors under 3142(g), the
21 nature and circumstances of the offense, I'm sure Your Honor
22 has seen a number of these cases so far.  This is not just a
23 misdemeanor case.  He has a felony.  The first count in the
24 Indictment is a felony, carries a maximum penalty of
25 five years.

1    The evidence in this case shows that he impeded

2 law enforcement when they were trying -- in the struggle to get

3 people out of the Capitol.  He did also -- he reacted

4 affirmatively to a law enforcement officer when they were

5 trying to clear people out.  The weight of the evidence is

6 strong, it's on video, and he has identified himself to the FBI

7 as being the person in the video.

8    As to his history and characteristics, Your Honor,

9 I've touched on a lot of it based on the basis for risk of

10 flight here.  I think it's important to note that there is this

11 sort of philosophical predisposition to flight that should be

12 very concerning to the Court.  When he had an opportunity to

13 report Christopher Worrell to law enforcement, presumably

14 Mr. Worrell approached him for help, he didn't, he took it upon

15 himself to help Mr. Worrell.  So, again, he has knowledge, he

16 has means, and now he has motivation.

17    I think I've mentioned too that Worrell cut his GPS

18 bracelet.  I want to pause on that, because to the extent that

19 the defense is going to say in this case it's sufficient to

20 allow him to stay home, home detention, GPS monitoring, in this

21 series of cases, Your Honor, that I would like to lump

22 together, the Pollocks and even Mr. Worrell, the GPS bracelet

23 has not done its job, they have -- they've had no problem

24 cutting the GPS bracelet, and once that was cut, it was

25 extremely difficult for the FBI to locate these people.

```
 1    In the case of Jonathan Pollock, he didn't have a GPS bracelet,
 2    but his sister did.  She was on the run for almost a year.
 3    Mr. Worrell, luckily, they were able to find after six months.
 4    So I don't think a GPS monitor in this case is going to do
 5    anything for Mr. Osborne, just based on his association with
 6    this group and the fact that he shares this sort of
 7    philosophical disposition to flight and that it's -- it's okay
 8    in these circumstances to not appear for court.
 9              Finally, Your Honor, the thing -- another thing
10    I want to mention is, I alluded to this before, there was a
11    December 2023 search of Mr. Osborne's home.  While inside,
12    agents observed what I would consider an astonishing number of
13    guns.  Perhaps there is an innocuous explanation for this,
14    I know he works at a gun store, but it's certainly -- from
15    speaking to the agent who was there and saw it firsthand, it's
16    far more guns than are the five guns that are listed in the
17    Pretrial Services Report.
18              I can list off some of the things that they saw in
19    plain sight.
20              THE COURT:  Go ahead.
21              MS. ASOKAN:  They saw in the main entryway a loaded
22    silver revolver on the top shelf of the closet next to the
23    front door of the residence.  In his master bedroom they saw an
24    AR-15 platform rifle next to the bed, a shotgun under the bed,
25    multiple handguns on top of the dresser, an alarming number of
```

1   magazines, loaded and unloaded, with different types of

2   ammunition.  And in various rooms of the house, I believe in

3   the master bedroom, the kitchen and spare bedrooms and living

4   room, there were stashed go bags that stored loaded magazines.

5            So, Your Honor, I can -- I can go on.  Again, in the

6   kitchen there was a handgun, there was another AR-15 platform

7   rifle, more magazines, more ammunition.  In the spare bedrooms,

8   handguns stashed on the shelves and desks.  In the living room,

9   same thing, handgun next to the La-Z-Boy chair, ammunition.

10  And in the living room too, several types of survival and

11  camping equipment.  And, finally, they also found a handgun in

12  his Ford Ranger.

13           So, again, I appreciate that Mr. Osborne is employed

14  at a gun store, but agents did observe this alarming number of

15  firearms in his home.

16           So, again, to the extent that it's going to be argued

17  that home detention is appropriate, one, home detention is not

18  appropriate because he lives by himself; but, two, Your Honor,

19  sending Pretrial to a home where there are this many weapons to

20  check on a man who has a past of disobeying court orders, or at

21  least not respecting the authority of a court order as it

22  concerns other people who are supposed to appear for court,

23  should give the Court significant concern.

24           And also, Your Honor, we know from sources that he is

25  engaged in -- or at least talked about engaging in violence.

1    He recently told somebody that it is a problem -- or,

2    excuse me, that he doesn't think it's a problem to blow up an

3    abortion clinic, but he did note that he wouldn't do that if

4    someone were inside.  So there are some concerns about sort of

5    the propensity of violence.  I realize -- you know, I'm not

6    trying to impede on anyone's First Amendment rights, but I do

7    think that takes it over the edge.

8             But for all the reasons I've just stated, Your Honor,

9    I think -- I keep coming back to it, it's knowledge, it's

10   means, and now it's motivation.

11            I'll lastly note, and Pretrial Services as well, and

12   you noted it as well, he has -- he has means in the form of

13   money as well, that I think goes to flight.  And so it's not

14   just the knowledge of how to do it, it's not just the go bags,

15   it's not just the survival, it's having money, it's being able

16   to survive on the run if -- if given the opportunity, and

17   certainly we know that he doesn't have a sort of philosophical

18   disagreement with doing that.

19            And I believe that's all I have for right now,

20   Your Honor.  I'm happy to answer any questions.

21            THE COURT:  Thank you.

22            Do you know, is the trust fund -- is it from the

23   Pollock family or is it from his regular family, if you know?

24            MS. ASOKAN:  One moment, Your Honor.

25            THE COURT:  And, Ms. Irvin, I'll ask you the same

1    question.

2             MS. IRVIN:  Yes, Your Honor.

3             MS. ASOKAN:  I'm not aware, Your Honor.

4             THE COURT:  Okay.  Ms. Irvin, if you could start by

5    answering that question and then make any argument you want to

6    about release.

7             MS. IRVIN:  Yes, Your Honor.  It's a trust fund from

8    his family that has to do with either gas rights or gas

9    proceeds that they receive.  The amount of money that he

10   receives is dependent on the stock market and, just generally

11   speaking, how gas is doing in a particular year.  As an

12   example, if you are a resident in the State of Alaska, you can

13   receive gas proceeds, but they're almost nothing now.

14   Maybe like 20 years ago they were much higher.  And so I think,

15   although the trust fund is there and he does receive a

16   percentage of that, it is not a reliable amount of money that

17   he receives.  Also, the money of that trust goes into a trust

18   and then he is gifted a certain amount of money from that.

19   And so I think that that's certainly something that Your Honor

20   and a future judge will have to take into account for purposes

21   of deciding whether he qualifies for court-appointed counsel,

22   but it's not such a great amount that it would be something

23   where I think it equates to the means that the Government is

24   alleging.

25             To deal with the issue of flight risk, I also want to

1    deal with danger to the community, and I'm going to start with
2    that.
3            He has no prior arrests or convictions.  We are
4    three years removed from January 6th.  He has no prior arrests
5    or convictions since January 6th and nothing before then.
6    And even though the Government did not address danger to the
7    community, I actually think we have to address danger to the
8    community, because that's what January 6th deals with, are the
9    concerns that happened that day.
10           In the other January 6th indictments and
11   Criminal Complaints that I've received before, there are
12   usually pictures, sometimes the prosecutor presents video, and,
13   I mean, on a Rule 5 kind of a case we're able to see within the
14   preliminary Complaint, sometimes within the Indictment, photos
15   of things that the person was doing.  We don't have those in
16   this case.
17           I do understand that there is a felony that is
18   charged, but we haven't received any information as far as the
19   proffer today or the information provided in the Indictment
20   from the District of Columbia that explains in detail or fact
21   what it was that Mr. Osborne is alleged to have been doing on
22   that day.
23           With respect to flight risk, he is a co-homeowner, so
24   he owns a home along with his father.  His father lives in
25   Pennsylvania, he is not in good health, and so that's something

1  that I think that Your Honor can take into account, because he

2  visits with his father sort of as needed but has a very close

3  relationship with his father, because his mother is deceased.

4  　　　　　He lives in Lakeland.  He does not have a passport.

5  He is not somebody who has traveled outside of the

6  United States as far as the Pretrial Services Office would be

7  able -- was able to identify.  He simply travels between

8  predominantly the town that his father and the rest of his

9  family live in in Pennsylvania and Lakeland, Florida.

10 　　　　　So let's talk about what the Government talked about,

11 knowledge, means and motivation.

12 　　　　　Any relationship that he has with the Pollock family

13 is a friendship, and all of the people who traveled --

14 I shouldn't say "all."  Many of the people that traveled to

15 January 6th traveled with prayer groups, traveled with friends,

16 traveled with neighbors, traveled with people that they worked

17 with.  These are groups of people who socialize together.

18 When they went to January 6th, they went in groups, generally

19 from the neighborhoods that they were from, so that's not

20 something that is unique to the situation.

21 　　　　　To the extent that the Pollock parents did anything

22 to help the Pollock children, who were co-defendants in

23 January 6th, of course they are parents who are helping their

24 own children.  They are not related to Mr. Osborne in any way.

25 Whether he's a friend or just somebody that they know as an

acquaintance I think has no bearing on this situation.

In respect to Ms. Osborne being a flight risk, how it does have a bearing on this situation goes to the knowledge that the Government is talking about. He knows what happens when someone cuts off their ankle bracelet. He has seen what happened when somebody doesn't abide by a court order, and as a result he understands the additional sanctions that he might face should Your Honor release him under conditions and the importance of him abiding by those conditions.

Any relationship that he has with Christopher Worrell -- I understand that it sounds like there's a relationship or a friendship and that Mr. Osborne let Mr. Worrell stay at his home. There's no indication that was proffered that Mr. Osborne knew on the day that he let him stay at his house that he was somehow evading a court order or doing something illegal. It sounds like he let him stay there because he was a friend. Again, I don't think that that's something that hurts Mr. Osborne, I actually think it helps, because knowing that Mr. Worrell likely will face further sanctions because of whatever order that he was defying, Mr. Osborne knows not to do that.

As I mentioned -- that sort of addresses the knowledge issue. We are three years past January 6th. He has seen what people that he knows have faced. He has seen the sanctions that they face for not abiding by court orders. He's

1    absolutely going to take that seriously.  He wants to be able

2    to address these charges in the District of Columbia.  And does

3    he have the means to be able to travel there?  Yes.  But he

4    doesn't have the means to be able to evade prosecution and

5    leave the jurisdiction, nor does he want to.

6           His motivation is to live in his home, where he has

7    been living for the past two or so years, and he's lived here

8    before in Lakeland.  He wasn't arrested today trying to evade

9    arrest.  He wasn't hiding.  The Pollock family wasn't hiding

10    him out somewhere.  He was at his house, that's where he was

11    arrested today, and that's where I think that Your Honor should

12    release him to.

13           He is employed.  I don't have any information having

14    to do with the Pollock family and their ownership or whether

15    they work at that particular gun shop, but if that's the place

16    that he's employed and it happens to be that he's friends with

17    them, I'm not sure how that impacts this.

18           I also want to address the number of guns that were

19    found in his home.  He's not a felon.  We live in the State of

20    Florida.  He's legally allowed to possess the firearms that he

21    had in his house.  However, he also understands that, should

22    Your Honor release him on conditions today, that he is going to

23    have to responsibly provide another person, which he says he

24    has, who would be able to take all of those firearms, any

25    weapons in the home that he should not have, and someone else

1    will secure them for him.  He absolutely understands that and

2    will abide by the conditions of Pretrial Services.

3           Pretrial Services officers carry weapons.  They are

4    trained in using those weapons.  I recognize that they are put

5    in situations that are not always great situations, but

6    I certainly recognize that they have the training to be able to

7    handle themselves and to be able to speak very candidly with

8    Mr. Osborne about how they expect him to be able to safely

9    remove those firearms from his home, and he will respect this

10   Court's order in doing so.

11          What is his motivation?  His motivation is to deal

12   with these charges in the District of Columbia.  His father,

13   who is his only parent who is living, is not doing well, he's

14   not in good health.  He wants to be able to maintain contact

15   with his father, and as a result of that, he wants to be able

16   to be released, to be able to continue to help his father

17   however he can.

18          And so we do think that there are conditions of

19   pretrial release that can be imposed for him.  Those include

20   that he remain at his same address where he has been living,

21   that he have some restricted travel to the District of Columbia

22   for court, the Middle District of Florida, and if the Court

23   will allow for him to be able to travel to the District of

24   Pennsylvania, where his father lives.  And I apologize that

25   I don't know whether it's the Western District of Pennsylvania

1  or not.

2         To the extent that Your Honor is concerned about his

3  appearance, he can sign a signature bond.  And he will provide

4  assurance through the Pretrial Services Office that he will

5  give any firearms or weapons that he is not supposed to have to

6  somebody else to secure them outside of his residence.

7         THE COURT:  I have a few questions for the

8  Government.

9         First of all, has Mr. Osborne -- has he known

10 about -- that he was under investigation?  I know he knows,

11 obviously, that others have been and that others were being

12 prosecuted, but did he know that he was under investigation

13 also?

14        MS. ASOKAN:  Yes, Your Honor, he has known.  He

15 actually turned himself in to the FBI.  I believe that was in

16 2021.  But before Your Honor credits him with that, I will note

17 that he turned himself in because another January 6th --

18 I think it was another January 6th associate, or at least

19 somebody who was aware of Mr. Osborne's involvement in

20 January 6th, threatened to turn him in.  So it wasn't a pure

21 motivation.

22        He also -- he was interviewed by the FBI.  He -- he's

23 also kind of bragged about his involvement at January 6th to

24 other people.  And so, yes, he's known, but a number of our

25 defendants know, and certainly the Pollocks knew they were

1    under investigation, Mr. Worrell knew he was under

2    investigation.  If you were present, you have a pretty good

3    idea that -- you know, that -- this is the largest

4    investigation that the Government has ever undertaken, they're

5    finding people, there's tip sites, there's all sorts of

6    mechanisms to find people.

7         But, Your Honor, I think it's important to note too

8    though that that was in, I think, September of 2021.

9    Everything changed from the Government's perspective with

10   regard to Mr. Osborne when we found out that he was harboring

11   or helped harbor Mr. Worrell.  And just so that -- to respond

12   to defense counsel, he wasn't doing it as an ignorant friend.

13   He is close to Mr. Worrell.  We have text messages with

14   Mr. Osborne -- between Mr. Osborne and Mr. Worrell's

15   girlfriend, and as well with Mr. Worrell, during the pendency

16   of his trial and that he was -- that he was facing charges.

17   They were communicating about it.  There are also significant

18   gaps in the text messages, which lead us to believe that

19   they've since been deleted, and there's nothing we can do about

20   that, but there's certainly evidence in those text messages

21   that he knew that Mr. Worrell was under Federal investigation,

22   had been charged, had been tried, had been convicted guilty on

23   all counts, and was facing sentencing in the middle of August

24   of last year, shortly -- around the time of when he cut his GPS

25   monitor.

1        So this was not the innocent friend, you know,

2    opening his door to a friend without knowing what the basis was

3    of him being there.  He knew, he participated in it, and

4    because of that, that should give the Court serious concern

5    about all the things that the defense is saying, that he wants

6    to face his charges, he is aware of what happens to January 6th

7    defendants.  Yeah, they do get caught, that means the

8    Government is doing their job, law enforcement is doing their

9    job, but that doesn't mean that he's not connected to a network

10   of people who found it okay to cut their GPS monitors and were

11   able to successfully evade law enforcement for some significant

12   period of time.  That's -- that's a significant drain on

13   Federal resources, to find these people.

14        Knowing what we know now about Mr. Osborne, the risk

15   is too high to allow him -- to give him the benefit of the

16   doubt that he's suddenly had a change of heart and that now he

17   appreciates why it was wrong to hold -- to house Mr. Worrell or

18   be connected to the Pollock family, who, you know, he -- he

19   could reach out to them, or they may even know about today, and

20   since they're so good at harboring these fugitives, there's

21   no -- there's no telling what they will be able to do with him.

22        And setting -- even setting aside the Pollock family,

23   he -- he can -- he can flee prosecution on his own.  He has the

24   means.  He knows what to do.  He was preparing for it.  He was

25   stashing go bags and survival kits.

Case 24-1280, Document 121, Filed 02/20/24, Page 30 of 39    Case 1:21-cr-00704-SAP    Document 112    Filed 02/20/24    Page 380 of 39D 45

29

1          So, yes, he's known about the investigation, like

2     most January 6th participants know about the investigation, but

3     the circumstances have changed now.

4          THE COURT:  Another question I had in terms of the

5     strength of the evidence, Ms. Irvin had raised the issue of

6     photos or videos, but I just want to make sure that my notes

7     were clear.  You indicated that there was video evidence of

8     him.  What was he doing with the police officers, I guess,

9     pushing police officers?

10          MS. ASOKAN:  Yes.  I can summarize it a little bit

11     better than I have already, but there is -- to answer your

12     initial question, yes, Your Honor, there is video evidence.

13          One thing too is I also have worked on a lot of these

14     January 6th cases, most of the time when they've come to this

15     Court they've come by Complaint, so there's obviously a great

16     number of factual details in those.  This case was indicted in

17     D.C., and normally, at least from my observation, we don't

18     include factual details or pictures in the Indictment, so it's

19     not because there isn't evidence, it's just the practice of it.

20          It's my understanding that Mr. Osborne was struck by

21     an officer as far as -- as part of the effort of officers to

22     push people out of the Capitol, and he reflexively turned

23     around and began to, you know, wrestle with the officer,

24     grabbing his baton, so there is physical contact and he is on

25     video engaging in those acts, and I believe that when he was

1  interviewed by the FBI he identified himself as being the

2  person in the video.

3         The weight of the evidence is extremely strong,

4  Your Honor, and because this is a felony case, I know he

5  doesn't have a criminal history, but there is a maximum penalty

6  of five years that he's facing, so the incentive to flee is

7  high.

8         THE COURT:  And what were the circumstances of his

9  arrest today?

10        MS. ASOKAN:  It's my understanding, Your Honor, that

11 Federal agents came to his house at six o'clock in the morning,

12 they called him to come out, and he did come out.  I understand

13 that there were no issues.

14        THE COURT:  Okay.  Is he in the same clothes that he

15 was in when he came out at 6:00 a.m. in the morning, or did he

16 change for court?

17        MS. ASOKAN:  I believe that he did not come out

18 clothed and they assisted him in putting clothes on.

19        THE COURT:  Anything else from the Government?

20        MS. ASOKAN:  No, Your Honor.  Thank you.

21        THE COURT:  Anything else, Ms. Irvin, that you want

22 to add now that I've asked Ms. Asokan those several questions?

23        MS. IRVIN:  Yes, Your Honor.

24        I do think it is notable that when the FBI agents

25 went to his home at roughly 6:00 a.m. this morning, that there

1    were no issues with arresting him and that he cooperated and is

2    in court today for that reason.  I think that that's a huge

3    indication that he understands when law enforcement show up,

4    what he's supposed to do, that he understands when Your Honor

5    issues an order that he's to abide by it, and I think that's

6    something that you should take into consideration in your

7    decision as to whether or not he should be released.

8            I have not had a circumstance on a Rule 5 client on a

9    January 6th Indictment or Complaint, including somebody who is

10   looking at a felony, where they haven't been released under

11   certain circumstances.  I was trying to think through if there

12   was somebody that I represented.  It doesn't mean that there

13   hasn't been someone who is similarly charged that another

14   person in my office represented and they were detained, but I'm

15   thinking about a handful of people that I've represented,

16   I want to say at least three or four here.  The only person

17   that I can think of that was detained was in Las Vegas, and it

18   was a January 6th case that was much closer in time to the

19   events and much more serious events and much more serious

20   conduct than what's being alleged in this case.

21           And I'm not saying that to minimize what has been

22   alleged here, but in comparison, I do think that this is a

23   situation that -- just based on my experience with these cases,

24   this is a situation where conditions can be formulated by the

25   Court to allow Mr. Osborne to be released.

 1             Another thing that I think is important and I failed
 2    to mention is that at some point I think that the Government
 3    noted that he proffered and he sat down with the Government.
 4    Pre-indictment he had been assisted -- represented by
 5    Jeff Brown.  Jeff Brown was in court -- Attorney Jeff Brown was
 6    in court today.  I spoke to him before court.  It was his
 7    understanding that he might not be appointed as CJA counsel, so
 8    there's not funds, from Mr. Brown's perspective, for him to be
 9    retained.  I should say that better.  Mr. Osborne does not have
10    funds to be able to retain Mr. Brown.  But I let him know that
11    there is a possibility that he could be appointed as CJA
12    counsel going forward.
13             Why I mention that --
14             THE COURT:  I think the appointments have all been
15    out of D.C.  It hasn't been -- we haven't -- the only ones
16    I know that have been appointed locally is when they've gone to
17    arrest the person and they're a felon and they find firearms
18    there, where they end up having a separate whole issue of cases
19    here and they're appointed locally.  I don't think they've been
20    appointing -- I think in D.C. they've been appointing attorneys
21    there.
22             MS. IRVIN:  And so there were, I think, early on --
23    I want to say two and a half or three years ago there was a
24    local appointment and somebody who retained someone, so that's
25    why I wasn't sure whether or not Mr. Brown would be able to

1  stay on the case.  That being said, he -- he has known about

2  this case and has been assisting Mr. Osborne, and I think that

3  that's also an indication.  If he had any thought, Mr. Osborne,

4  that he was going to leave or flee prosecution, he certainly

5  hasn't done that, he's done the opposite.  He sought the advice

6  of good counsel.  It sounds like he sat down and proffered.

7  He gave no fight in any way when he was arrested this morning.

8  I think he simply wants to go forward, like any of the other

9  individuals that we saw in court today who have been charged

10 with crimes, and he wants to be able to go home, figure out

11 what the next steps are going to be, and get ready to fight,

12 however it is that he decides to do that, the charges that he's

13 looking at.

14          THE COURT:  Okay.  Give me a moment just to look over

15 the statute and the standards.

16          So the burdens on risk of flight -- once the

17 Government is able to move under serious risk of flight as

18 being the basis, the burden is whether the Government can show

19 by a preponderance of the evidence that no conditions or

20 combination of conditions will reasonably assure the

21 defendant's presence as required.  So preponderance of the

22 evidence, that's lighter than clear and convincing, I think

23 it's higher than probable cause, it's, you know, somewhere in

24 there where you're having to determine whether -- how the

25 evidence weighs.  Does it weigh where it's -- you know, where

1  it's more likely than not, I guess is the best way, that there

2  are no conditions or combination of conditions that will

3  reasonably assure the defendant -- I guess it actually makes it

4  lighter than probable cause.

5       You know, honestly, here what I keep coming back to

6  in my brain is Mr. Worrell and the fact that he had been

7  sentenced and yet Mr. Osborne let him stay in his home.  I have

8  concerns -- and was messaging with him, so he knew at least the

9  circumstances.  I have concerns also about the stash bags and

10  the -- that he's got the survival kits and the camping supplies

11  and that he's ready to be able to flee should he wish to flee.

12  It's not a situation where the electronic monitor ties him to

13  his home.  It's an electronic monitor.  It's really up to the

14  person abiding by it and being willing to respect the order of

15  the Court and respect that they have certain conditions.

16       So here I do find that the Government has met the

17  preponderance of the evidence standard.  I think that based on

18  the prior search warrant, the number of firearms that he had,

19  the stash bags, the supplies to be able to flee, the fact that

20  he knows others that have successfully fled, albeit they

21  ultimately got caught, but they were able to flee for a while,

22  and the fact that he had somebody who fled from January 6th

23  prosecution -- or not prosecution, I guess, the -- serving the

24  sentence, that he had that person stay in his house, all of

25  that does support the Government's standard they have to meet

```
 1   for me to find by a preponderance of the evidence that he's a

 2   flight risk, so for those reasons I am going to detain

 3   Mr. Osborne pending his case.

 4              MS. ASOKAN:  Your Honor?

 5              THE COURT:  Yes.

 6              MS. ASOKAN:  May I just make one note for the record?

 7              THE COURT:  Yes.

 8              MS. ASOKAN:  I believe Your Honor noted that

 9   Mr. Worrell had been sentenced.  To the extent it influences

10   your decision, I just want to be clear for the record, he had

11   been convicted at trial by a bench trial and he was awaiting

12   sentencing.

13              THE COURT:  Awaiting.  Okay.  So that it wasn't that

14   he was awaiting turning himself in for the Bureau of Prisons,

15   he was convicted but had not been sentenced yet, so he fled

16   between the conviction and that 90 day period before being

17   sentenced.

18              MS. ASOKAN:  Correct.  And he has now since been

19   sentenced to 120 months.

20              THE COURT:  120 months.  Okay.

21              No, that to me does not change it, but thank you for

22   the clarification.

23              And I will enter a written order, and you're by all

24   means welcome to appeal that written order to the District of

25   Columbia.
```

1    And then the Government -- as required by Rule 5(f),

2  the Government is ordered to produce all exculpatory evidence

3  to the defense pursuant to Brady v. Maryland and its progeny.

4  Failing to do so in a timely manner may result in sanctions,

5  including exclusion of evidence, adverse jury instructions,

6  dismissal of charges, and contempt proceedings.  If you could

7  please confirm compliance.

8    MS. ASOKAN:  Yes, Your Honor.

9    THE COURT:  Anything else from the Government's

10  perspective?

11    MS. ASOKAN:  I'll just note, I think it was raised at

12  the beginning of the hearing about when his next hearing is

13  going to be.  I was told it can be done in two days.  Either

14  Your Honor can set a hearing, which, if I may, I don't know

15  that that makes the most sense --

16    THE COURT:  I think he'll be in person now, so he'll

17  be -- he'll be -- it will be a while probably --

18    MS. ASOKAN:  Okay.

19    THE COURT:  -- before he has it, but it will be once

20  he arrives in the District of Columbia.

21    MS. ASOKAN:  Understood.  Thank you, Your Honor.

22    THE COURT:  And, frankly, it's -- I mean, the reason

23  I had mentioned that in the beginning is I'm so used to

24  releasing January 6th people too.  I think this is the first

25  person I've detained.  But, frankly, I haven't had any

1  information like this presented to me before as well.

2  So that's why I brought up the hearing, is usually we have

3  information about -- usually as soon as we tell them, they give

4  us the information about when the next hearing is going to be.

5  So maybe in D.C. they knew more than I knew, I don't know.

6          Anything else from the Government's perspective?

7          MS. ASOKAN:  No, Your Honor.  Thank you.

8          THE COURT:  Anything else, Ms. Irvin, from the

9  defense's perspective?

10          MS. IRVIN:  No, Your Honor.

11          THE COURT:  Thank you.  We're in recess.

12                    - - - - -

13          (Proceedings concluded at 5:14 p.m.)

14                    - - - - -

```
 1                  C E R T I F I C A T E

 2

 3         This is to certify that the foregoing transcript of

 4    proceedings taken in an initial appearance and detention

 5    hearing in the United States District Court is a true and

 6    accurate transcript of the proceedings taken by me in machine

 7    shorthand from a digital audio recording and transcribed by

 8    computer under my supervision, this the 29th day of February,

 9    2024.

10

11

12                              /S/ DAVID J. COLLIER

13

14                         DAVID J. COLLIER

15                         OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25
```